KINCAID ET AL. *v.* MAGOWAN, ET AL.

[Kentucky Law Reporter, Vol. 6—99.]

**Joining Parties.**

Tenants in common or joint tenants claiming under the same title and dependent on the same questions to establish their rights to the land can maintain an . action against several defendants jointly, although each claim and hold separate parcels and have no joint possession, and persons holding separately may be sued jointly where not in possession but 'claiming from the same source separate interests against the common title and possession of the plaintiff.

**Alienation of Land, Minerals and Timber.**

The owner of land in fee simple can legally sell and convey the soil to one person, the growing timber thereon to another and the minerals to a third, and by ordinary deed invest the vendees with the several interests so secured and yet so possessed as to render their respective estates enjoyable.

APPEAL FROM MENIFEE CIRCUIT COURT.

June 19, 1884.

OPINION BY JUDGE HARGIS:

This case was decided upon a motion to compel the plaintiffs to elect which cause of action and which of several defendants named in the three separate paragraphs of their petition they would prosecute, and upon a general and special demurrer interposed after plaintiffs' election under protest to prosecute the second and third paragraphs. From the judgment compelling plaintiffs to elect and sustaining the general demurrer they appealed, and now present for our decision the questions of law determined by the judgment.

In each paragraph of the petition it is averred that the plaintiffs, the only children, grandchildren and heirs at law of Edward Kin-

43

caid, deceased, are the owners in fee and hold the legal title to and are in the actual possession of twenty-two thousand acres of land, except certain portions previously sold, lying in the counties of Menifee and Wolfe, which descended to them from their ancestor. The description by metes and bounds, courses and distances is set forth in their petition and their title papers filed, which consist of a patent to Dean Timmons, dated January 4, 1796, and signed by Patrick Henry, then governor of Virginia; a deed from Thomas Duckham to Plummer and said Kincaid, and a conveyance of his interest by Plummer to Kincaid, under whom all of the defendants, either mediately or immediately, claim to hold. There is no deed filed from Timmons to Duckham, but it is alleged that the latter was the owner at the date of his conveyance to Plummer and Kincaid.

The first paragraph alleges that William Gray, who is a nonresident, claims five hundred acres of the land under a deed purporting to have been made by Duckham as agent of Kincaid; but that Duckham was not his attorney in fact, and had no power or authority from him to make the conveyance or deed, which is exhibited and is not accompanied by any written or recorded power to make it. The second paragraph substantially states that the appellees, Magowan and others, as heirs of J. P. Magowan and Thomas Turner under them, are falsely setting up claim to and giving it out in speeches that they own and have the right to possess and to sell portions or interests in the land, and the minerals under and timber upon parts of said Timmons' patent boundary, which belong to the plaintiffs, and are thus impairing their rights and injuring their titles. By the third paragraph it is alleged that John M. Clayton is setting up claim to the land without right, etc., substantially as charged against the Magowans and Turners.

1. The plaintiffs' title is alleged in each paragraph to have been derived from the same source, and each of the defendants in all of the paragraphs are charged with claiming adverse to the same title, and asserting ownership of different portions of the same body of lands, embraced by that title; and the question is whether the defendants were properly joined. In the case of *Woolfolk v. Ashby*, 2 Metc. (Ky.) 288, this court decided that tenants in common or joint owners claiming under the same title and dependent

upon the same questions to establish their right to the land could maintain an action against several defendants jointly, although they claimed and held separate parcels and had no joint possession. This rule is supported by the cases of *Abney v. Barnet*, 1 A. K. Marsh. 107, and *Smith v. Shackleford*, 9 Dana (Ky.) 452. Newman on Pleadings, page 133, says: "If two or more persons be in possession, each occupying separate parcels of the same tract of land belonging to the plaintiff, it will not be necessary to sue them separately, but that they may all be sued jointly," and again, "If the plaintiff owned the whole tract, there would be no misjoinder by reason of their being all sued in one and the same action." If persons holding separately can be sued jointly there seems to be no good reason for not applying the same rule where the defendants are not in possession, but claim from the same source separate interests against the common title and possession of the plaintiff. This rule will prevent a multiplicity of suits about the same title which the plaintiffs have sought to quiet in this action. We are, therefore, of the opinion that the joinder of the defendants was proper and the judgment compelling plaintiffs to elect erroneous. There was no demurrer to the first paragraph, and, therefore, its sufficiency in law is not before us. Were a demurrer sustained to it an amendment might make it good, and at the proper time that opportunity should be given, if the paragraph be demurrable.

2. Whether the petition states a cause of action depends upon the right of the plaintiffs on the facts alleged to maintain this character of suit, which is in the nature of a bill quia timet, and on the validity of their title to the minerals and timber under the conveyances made to their ancestors by Duckham after he had conveyed the soil to the ancestor of the appellees, Magowan. It is alleged the plaintiffs are the owners of the legal title and in possession of the lands, or of the minerals and timber, which are really the subject of the action. The authorities in this state, as well as the statute on the subject, clearly authorize the action which the plaintiffs have adopted. In the case of *Armitage v. Wickliffe*, 12 B. Mon. (Ky.) 488, the court said: "If he had the possession, and the legal title, he had a right to institute his suit against any person setting up a claim to it or any part of it." The statutes of 1796 (1 Statute Law 1796, 294) expressly authorize a suit to be

brought in such a case, and we have no doubt, of the right of a person under such circumstances, to maintain a suit in a court of chancery independently of the statute, upon well established equitable principles. That was a bill quia timet. The statute of 1796 was re-enacted by the act of March 9, 1854, entitled "An Act to quiet the title to lands" (2 Stanton, 102) and revived by the act of March 17, 1856 (General Statutes, 846). Hostile claims which affect the market ability of title furnish sufficient grounds for an action of quia timet in behalf of the owner of the legal title, who is also in possession. The principal on which this action is authorized has been uniformly maintained by this court. *Beard v. Smith,* 6 T. B. Mon. (Ky.) 430; *Hiatt's Heirs v. Calloway,* 7 B. Mon. (Ky.) 178; *Dudley v. Trustees of Frankfort,* 12 B. Mon. (Ky.) 610; *Cates v. Loftus' Heirs,* 4 T. B. Mon. (Ky.) 439; *Landrum v. Farmer,* 7 Bush (Ky.) 46. The case of *Scott v. Means,* 80 Ky. 460, 4 Ky. L. 298, has no application to an action like this. In that case there was no allegation of possession in the plaintiff, and it was clear that the defendant was in possession, which was alleged to be unlawful; besides there is a great difference between a bill of peace and a bill quia timet.

The main question presented by this record has never been decided, so far as we can learn, by the courts of this state. Whether an owner of land can sell the soil to one, the timber to another and the minerals to a third person, and by ordinary deed invest the vendees with the several interests so severed, and yet so possessed, as to render their respective estates enjoyable, is a question of some moment, but, as we understand it, capable of practical solution.

By deed of February 2, 1842, Duckham conveyed a part of the Dean Timmons survey of twenty-two thousand acres to James P. Magowan, the ancestor of appellees, Magowan, but made the following exception from it: "The said Duckham reserves to himself all minerals and mines in the bowels of the earth in said boundary of land, and the one-half of the timber included in said boundary of land, and mill seat on said creek." On the 21st of November, 1842, he sold and conveyed to Magowan another tract of the Timmons survey, in which the following exception was made: "It is, however, understood that the said party of the first part reserves one-half of all mines and minerals in the bowels of the earth,

and one-half of the timber on said land, and all the timber on the south side of the river, except on Swift Camp."

Subsequent to these conveyances Duckham, on the ninth day of June, 1843, sold and conveyed to Kincaid and Plummer (with two other tracts) the tract of land patented to Dean Timmons for twenty-two thousand acres, in consideration of $1,500, "with a deduction of what the said Duckham has sold and made deeds to prior to this date." At the time this deed was made by Duckham he owned no interest in the Timmons survey except the mines, minerals and part of the timber and mill seat, and, it may be, some part not embraced by the conveyance to Magowan. It is contended that the conveyance to Kincaid and Plummer, who subsequently conveyed his interest to Kincaid, did not invest them with the mines, minerals and timber excepted from the deed to McGowan. Duckham sold and conveyed to Kincaid and Plummer all of the land he owned in the Timmons survey, and that meant the lands and all rights thereto and interests therein other than a chattel interest that he owned.

Since the Virginia revision it has been the law of this state that any interest in or claim to real estate could be disposed of by deed or will, and according to the proper construction of this deed the general alienation of the land conveyed all the right and estate that Duckham could lawfully convey, and we are of opinion, if the mines, minerals and timber are part of the land and the subject of severance and separate alienations, that he conveyed them to the apellants, whose averments must be considered as true for the purpose of this decision. The deed is broad enough to cover all of the grantor's title to any and all parts and interest which he owned in the Timmons survey, and as it must be construed more strongly against him there can be but little room, if any, to doubt that he intended by the general language used in the deed to convey, and that the grantees should understand that he was conveying, all interest which, under the statute of frauds, could alone be conveyed in writing, that he might or did own in the Timmons survey. The exceptions covered the property rights he had theretofore conveyed. The previous conveyances embraced only the soil, leaving him the owner of mines, minerals and timber, attached to and part of the land, and subject to the same rules of inheritance and alienation as the land itself. So we can see no good reason

for saying that his deed for all the land he owned in the Timmons survey should not cover the timber and minerals he had excepted and owned in and on the soil conveyed to another, any more than that the minerals and timber on any other portion of the land did not pass by the deed which excepts the interests of others, but does not except or reserve any of his interest or rights in the Timmons survey. When we look to the deeds to McGowan we find that they are only for the soil, the surface interest in the realty, but not for the mines, minerals or timber, which are as much a part of the realty or land as the soil itself. Having sold the soil to the Magowans, excepting the mines, minerals and timber as stated above, and thereafter conveyed all of his interest in the land, whether of, beneath or above the surface embraced by the Timmons survey, the only question remaining is, Were the exceptions from the Magowan deed valid, and did Duckham have the right in the law to convey the title to those excepted interests to the plaintiffs' ancestor?

Collier on Mines, p. 10, says: "The property in minerals and the right to search for them, may be vested in other persons than the owner of the fee, by alienations, by prescriptions, or by custom. The right to raise or dig minerals or use mines may be alienated without conferring the property right to the minerals until they are severed from the soil. So not only the use, but the title to the mine or mineral itself in an unsevered state, like trees before they are cut or identified, may be alienated, the requisites of the statute of frauds, which includes every sale of real estate or lands, being complied with." For the same work, p. 10, says: "An estate in minerals is considered an estate in land, and is transferable only under the same restrictions, whether conveyed with or without a conveyance of the adjacent soil; if conveyed without the land, no amount of nonuser will, it seems, be a relinquishment by the owner of them in favor of the owner of the land, or constitute adverse possession on his part, so completely separate are the estates." Bainbridge on the Law of Mines and Minerals, Dallas' American Edition, declares the law to be that property in mines may form and be held as distinct inheritance and possession, and that mines so held are "held either by grant or exception, or by virtue of acts of ownership which have produced an adverse possession against the owners of the surface," and that "the sev-

erance of mines is usually effected by exceptions in deeds (as in
this case) which transfer the freehold in the surface and reserve
the mines." He says further that "there are frequently even dis-
tinct ownerships, though generally for limited periods only, in dif-
ferent descriptions of mineral and in different deposits or strata
of the same kind of mineral. Thus one person may be entitled
to the iron, and another to the limestone; one steam or stratum
of coal in the same lands may belong to a third person, another
distinct seam to a fourth owner."

This law is the result of sound reason and necessity, and in ac-
cord with our free allodial titles and ownership in this state, where
there is no restriction which forbids this class of alienation.
There are many decisions in this country supporting and follow-
ing the texts from which the above quotations are made. See the
case of *Armstrong v. Caldwell,* 53 Pa. St. 284, and authorities
therein cited. In the case of *Caldwell v. Copeland,* 37 Pa. St. 427,
78 Am. Dec. 436, the general doctrine and mode of showing title
to mines, etc., is fully discussed and well stated. The court said:
"It is apparent from that part of the charge of the learned judge
which is recited in the first error assigned that he made the title
of Caldwell to the coal in dispute to depend altogether on the
actual possession which Caldwell had maintained of the surface,
and not at all upon his occasional entries to take coal, of which
there was evidence." It proceeded to hold that "this actual pos-
session of the surface carries with it the actual possession down-
ward perpendicularly through all the various strata. The actual
possession, therefore, was in the plaintiff.

"This proposition would be unquestionable if there had not been
a severance of the title to the mine right from that of the surface
by the deed of the twenty-seventh of May, 1831, Caldwell to
Greer. But it is not true that after such a severance, whether by
reservation or grant, the possession of the surface is possession
of the underlying mineral. That mines may form a distinct pos-
session and a different inheritance from the surface lands has been
long settled in England, as may be seen by reference to the cases
cited in the two opinions heretofore delivered in this case, and
reported in 31 Pa. St. 476 and 482. See also, *Barnes v. Manson,*
1 Maule & Sel. 84.

"It is a common occurrence in mining districts there, not only

that the ownership of the soil is vested in one person and that of the mines in another, but there are frequently distinct ownerships of the mineral in the same land. Thus one person may be entitled to the iron ore, another to the limestone, a third to one seam or stratum of coal, and a fourth to a distinct stratum.

"Title to any of these minerals, quite distinct from the title to the surface, may be shown by documentary evidence; or, in the absence of such evidence, or in opposition to it, title to them may be made out by proof of possession and acts of ownership under the statutes of limitation. The acts of ownership, however, which constitute possession and confer title must be distinct from such as are exercised over the surface. *Tyrwhitt v. Wynne,* 2 Barn. & Ald. 554; *Cullen v. Rich,* Bull N. P. 102. And see the same case under the name *Rich v. Johnson,* 2 Strange 1142. So entirely is a mineral right, after severance, a claim to land, and therefore not an incorporeal hereditament, that title to it can not be acquired by prescription. Prescription lies only for incorporeal rights; not for land. It may confer a right to work a particular mine, as it may confer a right of way across another's estate, or a right to fish in another's waters; but the title to mine itself, like title to land, must be made out by documentary evidence, or under the statute of limitations: *Wilkinson v. Proud,* 11 M. & W. 33, and the cases therein cited."

In many of the original colonial charters mines of gold, silver and precious stones were reserved to the crown, in which, according to the laws of England, the right to silver and gold mines was reserved or remained notwithstanding a general description in a grant by the king. Plowden, 336; 1 Blackst. Com. 294. Whether this crown right devolved to the confederation is a question of some doubt, yet the continental congress asserted it by statute in at least one instance, which was afterwards repealed.

Congress has often reserved mineral rights in the public lands which, from time to time, have been permitted to be taken up by settlers or granted to the states. In this state, however, no reservation has been made or asserted to the minerals against the title of the absolute owners, who derive title from the state as the original and ultimate possessor of the property in all lands within the state. We, therefore, see that the doctrine of severance of minerals and mines with the qualities of land still inhering in them,

subject to the laws of alienation of lands and contracts in reference thereto, has not only British law to support it, but also rules which have been applied to the public domain and adopted in different states for the regulation of sale, purchase, conveyance, title, possession and use of these severed and several interests in lands, whose value is thus greatly enhanced for the several uses to which they may be applied by persons of different skill and dissimilar occupations. It is not true that these rules of law which bring into varied use the different and separable elements of the landed property of the citizen are nonenforcible or calculated to produce confusion by reason of their refinement or impracticability. For a sufficient answer to this claim is to be found in the general rule of law, "that when anything is granted all the means of attaining it and all the fruits and effect of it are also granted." Illustration: "Thus, by the grant of ground a way to it is also granted, if there be no accustomed way. By a grant of trees there is also passed a power to cut them down and to take them away. In like manner a grant of mines also gives the right to work them unless there is some positive restraint in the language of the grant itself."

So every man who buys may understand, and is presumed to know, that every former exception or reservation lawfully made is accompanied by that implied condition which enables the owner of the thing, right, privilege, property or permission to enjoy it in a reasonable and substantial manner, without any unnecessary injury to the rights or property of the subsequent holder, who takes subject to such exceptions or reservation, whether absolute or qualified, with the right of entry or use to be exercised in a reasonable way.

Wherefore, the judgment is *reversed* and cause remanded, with directions to overrule the demurrer and the motion to elect. Judge Lewis dissenting.

*William Lindsay, S. F. J. Trabue, for appellants.*

*Peters & Tyler, H. C. Lilly, Thomas Turner, for appellees.*

[See *Kincaid &c. v. McGowan &c.*, 88 Ky. 91, 9 Ky. L. 987, 4 S. W. 802, 13 L. R. A. 289; *Campbell v. Disney*, 93 Ky. 42, 13 Ky. L. 919, 18 S. W. 1027; *Stuart, Trustee, v. Commonwealth*, 94 Ky. 595, 15 Ky. L. 513, 23 S. W. 367; *Shouse v. Taylor*, 115 Ky. 22, 24 Ky. L. 1842, 72 S. W. 324.].